### Chicago, Rock Island & Pacific Railway Company v. Jacob C. Adler, Administrator.

#### Gen. No. 4,743.

CONTRIBUTORY NEGLIGENCE—*when person injured at railroad crossing guilty of.* *Held,* from the evidence in this case, that the plaintiff who was approaching a railroad crossing in a wagon, studying a book, was guilty of such contributory negligence, as a matter of law, which barred a recovery.

Action in case for death caused by alleged wrongful act. Appeal from the Circuit Court of Will County; the Hon. ALBERT O. MARSHALL, Judge, presiding. Heard in this court at the October term, 1906. Reversed with finding of fact. Opinion filed October 10, 1907.

SNAPP, HEISE & DIBELL, for appellant; R. A. JACKSON and B. S. CABLE, of counsel.

JOHN W. D'ARCY, for appellee.

MR. JUSTICE THOMPSON delivered the opinion of the court.

This suit was brought by appellee to recover damages for the killing of Thomas Thompson, by a passenger train of appellant, at the crossing of its railroad over Center street in the city of Joliet. The appellee recovered a judgment for $7,000 and the railroad company appeals. The declaration contains three counts. The negligence alleged against the appellant in the first count is, that it ran its train at a speed of thirty miles an hour in violation of an ordinance that limited the speed of trains to twenty miles an hour. The second count alleges that it was the duty of the defendant to give warning to persons about to cross its tracks on Center street, of the approach of its engines and cars; it also alleges that the defendant maintained gates operated from a tower four hundred feet southwesterly from the Center street crossing, which tower also contained a bell which should be rung prior to the lowering of the gates on either side of its tracks at Center street, which said gates were lowered and bell rung from said tower prior to the approach of trains to said crossing before the date aforesaid; that the defendant failed to ring said bell or lower said gates at the approach of the train which struck the deceased; that the deceased was without notice of the approach of said train by reason of said failure to give such notice or warning of its train running at thirty miles an hour, which train struck a wagon and team driven by the deceased and killed him. The third count alleges an ordinance of the city of Joliet providing that every railroad in said city using steam power, shall maintain and operate gates at their own expense at every public street crossing when required by ordinance to do so, and at their own expense shall station flagmen at each and every other street not provided with gates; that the defendant shall maintain at its own expense gates and keep a gate tender at all times, day and night, at various streets, among them Center street; that defendant's gatemen in charge of the Center street crossing was not at his place of duty; that the gates at Center street were not lowered, but were negligently permitted to stand erect at the approach of the train, which was nine minutes behind time, and run-

ning at the rate of thirty miles an hour, and without notice or warning ran against and killed deceased. In each count it is alleged that the deceased was in the exercise of reasonable care. It is not alleged in any count that the deceased knew of the existence of the gates or that he relied for his protection upon the lowering of the gates or the ringing of the bell in the tower.

Appellant denies that it violated the ordinance in regard to the speed of trains, and admits it was guilty of the negligence charged in not lowering the gates, but it insists it is not liable for the damages resulting from the death of Thompson, because he was not in the exercise of ordinary care for his own safety, and thereby contributed to his own death; and that a peremptory instruction to find a verdict for the defendant was erroneously refused, and this is the only question argued by appellant.

The evidence shows that Center street, in the city of Joliet, runs north and south. The appellant's tracks, of which there are six, run northeasterly and southwesterly, or as stated by the witness Coplantz, half way between north and northeast. The angle between the railroad tracks and Center street north of the railroad and west of Center street is a very obtuse angle. At the point of intersection coming from the north Center street turns to the east so that at the point of crossing, the street and railroad are nearly at right angles. The line of the street north and west of the crossing rises on an even grade from the crossing so that at Blackburn's store, which is about three hundred feet from the crossing, the street is about fifteen feet higher than the railroad. In the obtuse angle between the street and the railroad on the west side of the street is an abandoned stone quarry. There are no obstructions of any kind between the street and the railroad on the west side of the street between Blackburn's store and the crossing. To a person approaching the railroad from the north down this hill, there is an unobstructed view of the tracks almost directly in front of him for a quarter of a mile southwesterly from the crossing, all the way from Blackburn's store to the crossing.

The railroad curves to the west several blocks west of Center street so that as a traveler approaches the crossing the view extends further along the railroad. Half way between the store and the crossing, to a traveler approaching the crossing, there is an unobstructed view of the track for half a mile· to the southwest, the distance increasing the nearer the traveler gets to the crossing. The fourth track from the north is the east bound track of appellant, and is the track upon which appellant's train coming from the southwest struck the deceased.

On the morning of the accident about nine o'clock, the deceased, driving a United States Express Company's wagon, drove south down the hill towards the railroad with an unobstructed view of the track in front of him if he looked. Murphy, a witness for appellee, testified that the train was going at a rate of thirty-five miles an hour; several witnesses testified that the train was going from eighteen to twenty-two miles an hour. The gate keeper who operated the gate at Center street and also at McDonough street, an east and west street which crossed the railroad and Center street south of the Center street crossing, from a tower between these streets, on the east side of the main tracks of the railway, one hundred and fifty feet from the Center street crossing and forty feet from McDonough street, was oiling the gates at McDonough street when the train approached. He ran towards the tower but the train, which was ten minutes late, passed the Center street crossing, striking the express wagon and killing Thompson, before the gates could be lowered. The bell on the tower was not rung but there is proof that an automatic bell on the engine was ringing and no allegation was made in the declaration that it was not ringing. The deceased was fifty-two years of age, vigorous and in the possession of all his faculties. The day was clear and the accident was seen by several witnesses. The deceased was observed from the time he passed Blackburn's store, and there is no conflict in the testimony as to the acts of the deceased from the time he passed the store until he was struck by the train.

The horse came down the hill at a slow trot. The deceased sat on the seat of the wagon with a book, probably the express company's book for the receipt and delivery of packages, in his lap, turning the leaves, with the lines hanging over the dash board loose in his hand. Norbert Malloy, aged eleven, Albert Wills, aged thirteen, William Anthony, aged twelve, and a younger brother of Wills, were playing in the quarry pit. Malloy testified that Albert Wills shouted to Thompson to look out for the train, and then he, Malloy, shouted just as the horse was dropping into a walk, and Thompson looked up and slapped the horse and tried to hurry him. Albert Wills testified that he had come out of the quarry pit and was standing on Center street, and saw the train coming and Thompson coming down the hill, that he saw the book in Thompson's hand just on the west side of the track, and as he was crossing the first track, and that the horse was then walking. He says that he was about fifty feet distant from Thompson, and that he shouted to him twice but does not think Thompson heard him. Murphy, a supervisor, who was delivering grain at an elevator northeast of the crossing, saw the deceased coming down the hill, "and wondered when he would stop." Murphy said he took particular notice to see whether the gates would go down, because the driver was not looking at his horse. It is argued that there were cars standing on the side tracks west of Center street that would obstruct the view of a person driving down Center street. Appellee's witnesses, Malloy and Murphy, both testified that no cars were standing on the side tracks west of Center street and north of the east bound track, and Murphy says there was nothing to obstruct Thompson's view of the train had he looked. The testimony shows that the deceased was not in the exercise of ordinary care for his own safety; that he was absorbed in thought of other affairs than such as related to his surroundings, and pursued his way as though oblivious of things about him. The law requires a traveler on the street to use ordinary care for his own safety. The angle between the tracks and Center street south of the railroad and west of Center street is

a very acute angle, being about twenty-five degrees. The line of the railroad is within the line of vision of a person looking south on Center street from anywhere north of the crossing. There was no obstruction between him and the train for over half a mile after the deceased was within one hundred and fifty feet of the crossing. He and the train were approaching almost facing each other. The train was in plain view below and in front of him. It is neither alleged or proved that he knew there were any gates at this crossing or that he relied on their being open as an invitation to cross. He did not look to see whether there were gates or not, but heedlessly permitted his horse to jog along until aroused to his danger by the shouts of others. His danger was apparent to even small boys. A railroad crossing is a dangerous place. The deceased did not approach the crossing in an ordinarily prudent manner but in a careless and heedless manner. His physical senses were wholly absorbed in studying his book, without any thought or attention to where he was going. In this state a traveler is not necessarily required to stop, look and listen, but he must use his senses of sight and hearing or do what an ordinarily prudent man would do under like circumstances. There is no dispute or controversy about the manner in which the deceased approached the crossing. The evidence is such that reasonable men of fair intelligence can draw but one conclusion from it, that the deceased was not in the exercise of ordinary care for his own safety. In such case the question of ordinary care becomes a question of law for the court. If the only reasonable conclusion to be drawn from the uncontroverted evidence is, that the deceased was not in the exercise of due care, then the question of the degree of care should not be submitted to a jury but is a question of law that the court must act upon. C. & N. W. Ry. Co. v. Hansen, 166 Ill., 623. The record fails to show that Thomas Thompson was in the exercise of due care, but does show affirmatively that he was guilty of negligence that contributed to his death. It was error to refuse to give the peremptory instruction requested. The case is therefore reversed.

*Reversed, with finding of fact.*

Finding of fact, to be incorporated in the judgment of the court: The death of Thomas Thompson was caused by his own negligence and want of ordinary care.